IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RYAN SUMMERVILLE,

       Plaintiff,

vs.                             No.  06cv1086 DJS

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

### MEMORANDUM OPINION

**THIS MATTER** is before the Court on Plaintiff's (Summerville's) Motion to Reverse and Remand for a Rehearing **[Doc. No. 15]**, filed April 2, 2007, and fully briefed on June 6, 2007.  On December 29, 2005, the Commissioner issued a final decision denying Summerville's claim for supplemental security income payments.  Pursuant to 42 U.S.C. § 405(g), Summerville seeks judicial review of the Social Security Administration's denial of his claim for supplemental security income payments under Title XVI of the Social Security Act.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is not well taken and will be **DENIED**.

### I.  Factual and Procedural Background

Summerville, now twenty-one years old (D.O.B. 12/21/1985), filed his application for supplemental security income payments on September 30, 2004 (Tr. 12), alleging disability since September 30, 2004 (*Id.*), due to seizures, a learning disability, and a dislocated shoulder.  Tr. 12.

---

[1] On February 1, 2007, Michael J. Astrue became the Commissioner of Social Security.  In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Astrue is substituted for Jo Anne B. Barnhart as the defendant in this action.

Summerville graduated from high school but has the equivalent of a marginal education and no past relevant work experience.  Tr. 19.

On December 29, 2005, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding Summerville was not disabled as he "retained the residual functional capacity (RFC) to perform work that existed in significant numbers in the National economy."  Tr. 19.  The ALJ also found Summerville's was not entirely credible.  Tr. 16.  Summerville filed a Request for Review of the decision by the Appeals Council.  On October 11, 2006, the Appeals Council denied Summerville's request for review.  Tr. 8.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Summerville seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must

2

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

"'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)(quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). The court "may not 'displace the agenc[y]'s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Id.* (quoting *Zolantski*, 372 F.3d at 1200).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*, 987 F.2d at 1487.

3

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past.  20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse and remand, Summerville makes the following arguments: (1) the ALJ's RFC determination is not supported by substantial evidence and is contrary to law thus tainting the ALJ's hypothetical question to the vocational expert (VE); and (2) the VE's testimony conflicted with the DOT and the ALJ failed to seek clarification.

## A.  Residual Functional Capacity (RFC)

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his or her conclusion. See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  *Id.*  The ALJ must also explain how "any material inconsistencies or ambiguities in the case record were considered and resolved."  *Id.*  "The RFC

assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." *Id.*

In her decision, the ALJ found:

> Mr. Summerville's residual functional capacity is as follows:  He has no exertional limitations, but should avoid concentrated exposure to unprotected heights and hazardous moving machinery and climbing ropes, ladders and scaffolds to the extent that such postural maneuvers expose him to unprotected heights.  He can understand, remember and carry out simple instructions and tasks in a routine work environment requiring reading ability at no more than 3rd grade level and mathematical ability at no more than 6th grade level.

Tr. 17.

Summerville asserts the ALJ failed to include all his limitations in the hypothetical questions to the VE.  However, hypothetical questions to the VE need not take into account all of claimant's alleged impairments.  Questions to VE are proper when they take into account the impairments substantiated by the medical reports and the impairments accepted as true by the ALJ.  *See Gay v. Sullivan,* 986 F.2d 1336, 1340-41 (10th Cir. 1993); *Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990).  Summerville contends Dr. Padilla, an agency consultant, concluded he had marked impairments in this ability to maintain concentration, persistence and pace, and in his ability to work without supervision.  Therefore, Summerville argues the ALJ's failure to include these limitations in her hypothetical question to the VE was error.

Eligio R. Padilla, Ph.D., performed a psychological evaluation at the request of the Disabilities Determination Services on April 13, 2005.  Tr. 174-179.  Dr. Padilla's evaluation indicated, in pertinent part, as follows:

> <u>Sensorium</u>
> **Attention: WNL (within normal limits)**
> **Concentration: WNL**

Orientation: oriented regarding person, placed and situation, mildly disoriented regarding time– he thought it was April 15, 2005

Thought and Language
Speech Flow: WNL, after years of speech therapy
Thought Content: future oriented but vague– thinking about employment and further education, with the help of DVR; no indication of suicidal or homicidal ideation
Preoccupation: none noted
Hallucinations: no indication of hallucinations specifically, or thought disorder in general
Organization: WNL

Executive Functions
Fund of Knowledge: better than expected, given his problems with reading
**Intelligence: apparently average**
Abstraction: WNL
Judgment: WNL
Reality Testing: normal
Insight: WNL
Decision Making: WNL
ADLs:  He can manage activities of basic living except for transportation.  He does not have a driver license or vehicle.

Tr. 175-176 (emphasis added).  Dr. Padilla included a narrative assessment of Summerville.

Ryan Summerville is a young man of average cognitive abilities with a textbook example of a learning disorder manifested primarily in terms of serious reading and written language deficits.  He also has a seizure disorder that has been medically determined and is treated with fair success with anti-convulsant medication.  However, a seizure led to his dismissal in his first attempt at employment after graduating from high school.  Given his average IQ, but taking into consideration his learning disorder and medically-documented seizure disorder, his prognosis is fair and could improve if he receives case management and the right mix of support over the next few years, including a tolerant employer that can accept his academic deficiencies and his physical condition.  His ability to communicate verbally did not seem to be a major problem, but the last evaluation by a speech and language pathologist at Albuquerque Public Schools should be obtained and reviewed.

Tr. 177.  Dr. Padilla completed a Psychological Source Statement of Ability To Do Work-Related

Activities, opining Summerville was "markedly limited" (1) in his ability to understand and

remember detailed or complex instructions, (2) in his ability to work without supervision; and (3)

in his ability to use public transportation or travel to unfamiliar places.  Tr. 178.  Finally, Dr.

6

Padilla opined Summerville could "manage benefits in his best interests" based on Summerville's

math skills, his average cognitive skills, and because he was "a responsible young man."  Tr. 179.

The ALJ considered Dr. Padilla's evaluation noting:

In assessing a claimant's residual functional capacity, the fact finder must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  20 CFR §416.929 (See also, Social Security Ruling 96-7p).  The fact finder must also consider any medical opinions, which are statements from acceptable medical sources that reflect judgments about the nature, severity, and resulting limitations of the claimant's impairments.  20 CFR §416.927, Social Security Rulings 96-2p and 96-6p.

Insofar as Mr. Summerville has impairments that more than minimally affect work activity, I find his assertions are credible.  His assertions as to the limits they impose, however, are not fully credible.  Mr. Summerville testified that since September 30, 2004, he has experienced grand mal seizures about once every week.  He further testified that the Depakote Dr. Berger prescribed to control his seizures was ineffective.  However, records from Dr. Berger reflect that Mr. Summerville's seizures were controlled with Depakote.  [Exh. 2F].  In fact, the only time Mr. Summerville  had a seizure after starting Depakote was when he was not taking his medication as prescribed.  [Exh. 2F/4].  Furthermore, he stated that he could not take Depakote because it was too expensive, since he was no longer covered by insurance.

When questioned further on this issue, he testified that he had been referred for a program to obtain medication at reduced cost, but that he failed to follow through with it.  Moreover, the record shows that Mr. Summerville lives with his mother [Exh. 5E].  Presumably, this saves Mr. Summerville certain living expenses.  **Furthermore, Mr. Summerville works at a supermarket at approximately 30 hours per week**.  Given the alleged severity of his condition, Mr. Summerville should be able to prioritize his needs in order to come up with money for medication, even if it costs $100 per month as he testified.  **Finally, the frequency of seizures, as Mr. Summerville reports, is undermined by the fact that he continues to work at a job requiring the use of knives or saw, i.e., cutting chicken meat, without adverse consequences**.

As to Mr. Summerville's learning disorder, I note that his major deficits are in the areas of reading and written language. [Exh. 6F/4].  The residual functional capacity I have determined accommodates these deficits, consistent with his measured abilities.  **Furthermore, I note that Mr. Summerville's IQ is in the average range, he has average cognitive skills, and his executive functioning falls within normal limits**. [Exh. 6F/3-4].  **I note that in assessing Mr. Summerville's mental functions, the consultative examiner assessed limits based on Mr. Summerville's physical impairment, as well**.  For example, he opined Mr. Summerville had a marked limitation in his ability to use public transportation or travel to unfamiliar places, citing a lack of driver's license and vehicle, as well as reading and written language deficits. [Exh. 6F/5].

7

**However, the record shows that Mr. Summerville does not have a driver's license because he has not been seizure free for one year, as New Mexico requires. [Exhs. 2F/20, 2E/4]. This has nothing to do with the mental ability to drive a car. Likewise, Dr. Padilla's assessment of claimant's ability to work without supervision factors in Mr. Summerville's seizure disorder, and is not based solely on Mr. Summerville's mental capacity to work without supervision.** *Id.* If so, a person with a marked limitation in that area probably would not be able to "manage benefits in his best interests," as Dr. Padilla opined he could. [Exh. 6F/6]. **Moreover, in describing the work he has performed, including the job he currently works, Mr. Summerville reported no functional problems. His ability to sustain his current job, albeit below the level of substantial gainful activity, evidences Mr. Summerville's ability to perform simple, unskilled work.**

Tr. 16-17 (emphasis added). Thus, the ALJ set forth the evidence, which is substantial, to support her RFC determination. Moreover, the evidence does not support Summerville's assertion that Dr. Padilla concluded he had "marked impairments in his ability to maintain concentration, persistence and pace." In fact, Dr. Padilla found Summerville's attention and concentration to be within normal limits (Tr. 175) and, in his Psychological Source Statement of Ability To Do Work-Related Activities, Dr. Padilla noted Summerville was "**mildly** limited" in his ability to attend and concentrate (Tr. 178). Accordingly, Summerville's argument that the ALJ failed to include this limitation in the hypothetical question to the VE is without merit.[2]

Summerville also claims Dr. Padilla opined he was "markedly limited" in his ability to work without supervision, yet the ALJ failed to include this limitation in her hypothetical question to the VE. However, the ALJ fully explained her reasoning for not including this limitation in her hypothetical question to the VE. Dr. Padilla based this limitation on Summerville's seizure

---

[2] Moreover, even if Summerville had deficiencies in concentration, persistence, and pace, the ALJ's RFC assessment included the limitations that Summerville could "understand, remember and carry out simple instructions and tasks in a routine work environment." Tr.17. These limitations in the ALJ's RFC assessment would adequately account for Summerville's deficiencies in concentration, persistence, and pace. *Nixon v. Barnhart*, 49 Fed.Appx. 254, 256 (10th Cir. Oct. 21, 2002)(concluding that description of claimant as capable of doing simple, repetitive jobs adequately accounted for deficiencies of concentration, persistence, or pace).

disorder.  However, substantial evidence supports the ALJ's finding that the "records from Dr. Berger reflect that Mr. Summerville's seizures were controlled with Depakote" and that "the only time Mr. Summerville's had a seizure after starting Depakote was when he was not taking his medication as prescribed."  Tr. 16; *see e.g.,* Tr. 153 (**01/31/2003** medical notes by Dr. Berger (neurologist) –  "The patient had a recent breakthrough seizure.  This may have been because he was taking all of his Depakote tablets at one time.  The half-life is too short to be taking all of the medication as a single dose."); Tr. 149 (**02/14/2003** Laboratory report – **Depakote level of 37 indicating sub-therapeutic level**); Tr. 152 (**02/21/2003** medical notes by Dr. Berger – "Since I saw the patient he has had a generalized tonoclonic seizure. **The father had the patient stop his medicine**." ); Tr. 148 (**03/14/2003** Laboratory report– **Depakote level of 54 indicating therapeutic level**);  Tr. 151 (**06/06/2003** medical notes by Dr. Berger – "He has been taking Depakote 250 mg, 2 tablets p.o. b.id.  He denies any side effects from the medication and **he has had no seizures.**" ); Tr. 146 (**07/30/2003** Laboratory report– **Depakote level of 14 indicating a sub-therapeutic level**); Tr. 150 (**09/26/2003** medical notes by Dr. Berger – "**He has had no seizures on this higher dose**.  He denies any side effects or new neurologic symptoms."); Tr. 144 (**12/08/2003** Laboratory report– **Depakote level of 64 indicating therapeutic level**); Tr. 141 (**12/15/2003** medical notes by Dr. Berger – "**He has been doing well with no seizures.  He has had no seizures since August 31, 2003**.  **A recent Depakote level was 64 (therapeutic level)**. Seizure disorder under good control. Will see the patient one year or sooner."); Tr. 139-140 (**11/18/2004** medical notes by Dr. Berger – "The patient presents with a recent breakthrough seizure.  This in part may be related to some **noncompliance**.  **A Depakote level in October of 2004 was 39 (sub-therapeutic level)**." ); Tr. 138 (**12/23/2004** medical notes by Dr. Berger – "The

9

patient returns today stating that he is doing well.  **He has had no further seizures** and denies any side effects from medication.  **An EEG performed today revealed no seizure discharges**.  **A Depakote level was 96** (therapeutic level).  **I will see the patient in one year**.").

Moreover, as the ALJ noted, Summerville reported no problems in performing his job with Albertson's without supervision.  At the November 21, 2005 Administrative Hearing, Summerville testified he had been performing this job for about three months and averaged 30 hours per week.  Tr. 208-209.  Summerville further testified he wrapped meat, cut chicken, and attended customers.  Tr. 209-210.  The VE testified the meat wrapper job was classified as medium work and unskilled with an SVP of 2.  Tr. 223.  The chicken cutter job was classified as medium work and **skilled** with an SVP of 2.  *Id*.

Summerville's Function Report-Adult also supports the ALJ's finding that Summerville reported no functional problems.  Summerville reported he walked, used public transportation without problems except for needing someone to go with him in case he had a seizure. Tr. 64.  In fact, Summerville reported he took the bus when seeking work (Tr. 61) because he could not drive until he was seizure-free for one year (Tr. 64).  Summerville also reported he was able to pay bills, count change, handle a savings account and use a checkbook/money orders.  Tr. 64.  Additionally, Summerville reported he socialized three times a week (Tr. 65), shopped for food and clothes (Tr. 64), walked two miles, could pay attention for an hour, could follow written and spoken instructions (Tr. 66), and handled changes in routine "alright" and stress not very well (Tr. 67).

Summerville's mother also completed a Function Report Adult– Third Party on March 26, 2005.  Tr. 79-87.  Summerville's mother reported DVR was assisting him in finding a job.  Tr. 79.  She also reported that Summerville was learning how to cook, prepared meals three times a week,

was able to do household chores, laundry, ironing, and mowing.  Tr. 81.  Significantly, she reported

Summerville could use public transportation **alone** and was not allowed to drive until he was

seizure-free for one year.  Tr. 82.  Summerville's mother  confirmed that he could pay bills, count

change, handle a savings account, and use a checkbook/money orders.  *Id.*  She also described a

very active and social life indicating Summerville went "to events" about once a month, looked for

work, and participated in Bible study about 4-5 times a week.  Tr. 83.  Based on the record as a

whole, the ALJ's hypothetical question to the VE was proper.

**B.  Vocational Expert Testimony**

Summerville also contends the ALJ failed to determine whether a substantial number of

jobs remained after the VE testified some jobs would be reduced in response to Summerville's

counsel's hypothetical questions.  In response to the ALJ's hypothetical question, the VE testified:

ALJ:    Okay.  Ms. Bowman, I'd like you to consider an individual of the claimant's age,

education, and vocational background as [Mr. Summerville].  Furthermore, I would like to

assume that this individual can lift, and carry– is unlimited in his ability to lift and carry,

sit, stand,, and, or walk, push, and, or pull with the upper, and lower extremities.  He has

no manipulative limitations.  He should avoid concentrated exposures to unprotected

heights, and operating [inaudible (dangerous)] machinery.  He can climb ropes, ladders,

and scaffolds only to the extent that he's not exposed to unprotected heights.  Furthermore,

he can understand, remember, and execute simple instructions and tasks in a routine work

environment.  All right.  **Based on that hypothetical**, could you cite some work

[inaudible] perform?

11

VE:     Yes, Your Honor.  There were just a couple at the medium area, because of the hazards of

dangerous machinery, but one of them would be **odd-job worker**, and that's an unskilled

medium job with an SVP of two.  That DOT is 301.687-010.  There's 423,000 jobs in the

national economy, and **300 jobs in New Mexico**.  **Industrial cleaner**.  That's a medium,

unskilled job with an SVP of 2, and DOT is 381.687-018.  There's 3,000,000 jobs in the

national economy, and **2,200 jobs in New Mexico**.  In the light unskilled job [inaudible]

job a **bus person** at a restaurant fast food.  DOT 311.677-018.  There are 114,000 jobs in

the national economy, and **1,300 jobs in New Mexico**.  Sales' attendant.  That's an

unskilled light job with an SVP of two.  That DOT is 299.677-010.  There is 1,000,000

jobs in the national economy, and **4,000 jobs in New Mexico**.

ALJ:    Now, if we were to assume that this individual had an education at a level– he was able to

perform mathematic operations at a sixth grade level, as well as having a reading ability at

the third grade level, would the job base change in any way?

VE:     Yes, Your Honor.  I would eliminate the sale's attendant position because of customer

service [inaudible] in and out that might affect, and reduce the number of industrial

cleaners by 50 percent because [inaudible], and the rest of them remain.

Tr. 223-225.  After the second hypothetical question to the VE which incorporated Summerville's

educational level, i.e., his ability to do mathematics at the sixth grade level and reading at the third

grade level, a total of 2,700 job remained in New Mexico.  Summerville's counsel then questioned

the VE and added other limitations to the ALJ's **first  hypothetical question to the VE**.  However,

as previously noted, questions to VE are proper when they take into account the impairments

substantiated by the medical reports and the impairments accepted as true by the ALJ.  *See Gay,*

25

986 F.2d at 1340-41 (10th Cir. 1993); *Talley*, 908 F.2d at 588.  The transcript of the November 21,

2005 Administrative Hearing indicates the ALJ questioned the VE extensively in regards to how

each limitation affected the number of jobs listed by the VE.  *See* Tr. 225-230.  The ALJ noted she

would review the evidence and arrive at a decision.  Tr. 230.  The Court also notes that even with

counsel's additional restrictions to the ALJ's first hypothetical question to the VE, the VE testified

Summerville could still work but it "would make it even harder to get a job."[3]  Tr. 227.

Ultimately, the ALJ found:

> In the course of giving testimony, Pamela Bowman, vocational expert, testified in response to hypothetical residual functional capacities posed.  Consistent with the vocational expert's opinion, a person with Mr. Summerville's residual functional capacity would be able to perform the following occupations in numbers existing in the national and regional (State of New Mexico) economies as described: medium work such as odd jobs worker, light and unskilled (svp2), DOT 301.687-010, 423,000 in the nation and 300 jobs in the region of New Mexico; industrial cleaner, medium and unskilled (svp2), DOT 381.687-018, 1.5 million in the nation and 1,150 in New Mexico; and light work such as restaurant bus person, light and unskilled, DOT 311.677.018, 114,000 in the nation and 1300 in New Mexico.

Tr. 18.  Nonetheless, Summerville states:

> Counsel then added further restrictions from Dr. Padilla's and the DDS doctors' assessments: a moderate limitation in the ability to respond appropriately to changes in the work setting; a moderate limitation in the ability to complete a normal workday and work week without interruptions from psychologically based symptoms; and a moderate limitation in the ability to perform at a consistent pace without an unreasonable number and length of rest periods.  **The VE responded that the number of jobs would be reduced by 50%**.  The ALJ failed to determine whether a substantial number of jobs remain after these reductions.  This was error because the ALJ is required to make a specific determination whether the number of jobs satisfies the statutory definition of a "significant number."

Pl.'s Mem. in Support of Mot. to Remand at 9 (internal citations to transcript omitted) (emphasis

added).  However, the November 21, 2005 Administrative Hearing transcript indicates

---

[3] Counsel asked the VE the following question: "Is your testimony then that if an employee has an unreasonable number and length of rest periods, and is unable to perform at a consistent pace on a regular basis, is that employee then able to maintain employment."  Tr. 227.  The VE responded: "That would make it even harder to get a job."  *Id.*

Summerville's counsel added restrictions to the ALJ's first hypothetical question to the VE. Under the ALJ's first hypothetical to the VE, the VE testified there were 7,800 jobs in New Mexico (odd-job worker– 300 jobs, industrial cleaner– 2,200 jobs; bus person at a restaurant fast food– 1,300; sale's attendant– 4,000).  Tr. 224.  Thus, even accepting Summerville's additional restrictions to the ALJ's first hypothetical, and reducing the jobs by 50%, 3,400 jobs remain, a number greater than the 2,700 jobs the ALJ found to be significant.

Next, Summerville cites to Appendix C of the DOT in support of his contention that he is not qualified to perform the jobs of odd-jobs worker and industrial cleaner because those jobs require a reasoning level of 2 and require the ability to

> Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

Pl.'s Mem. in Support of Mot. to Remand at 11.[4]  Social Security Ruling 00-4P (Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions) states, in pertinent part:

> The DOT (Dictionary of Occupational Titles) lists **maximum requirements** of a particular job as it is performed in specific settings.  A VE, VS, or other reliable source of occupational information may be able to provide **more specific information** about jobs or occupations than the DOT.

_____

[4] Summerville contends the "[t]he ALJ found that Mr. Summerville reads at the third grade level" and "that this was a marginal education, but in fact it is the equivalent of illiteracy." Pl.'s Mem. in Support of Mot. to Remand at 11.  The Court disagrees.  Under the regulations, "[m]arginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs.  [The Agency] consider[s] that formal schooling at a 6th grade level or less is a marginal education."  20 C.F.R. §416.964(b)(2).

Soc.Sec.Rul. 00-4P, 2000 WL 1898704, at *3 (emphasis added).  Thus, the DOT lists the **maximum requirements** for a position as it is generally performed, not the full range of requirements.  *Hass v. Barnhart*, 91 Fed.Appx. 942, 948, 2004 WL 396982, **6 (5th Cir. Mar. 4, 2004).  The ALJ properly relied upon the VE in receiving more specific information about available jobs for Summerville.  Moreover, "[w]ork that requires 'commonsense understanding' is simple.  Work that requires 'uninvolved written or oral instructions' is simple and routine." *Temple v. Callahan*, 1997 WL 289457, *2 (C.D.Cal. May 9, 1997); *see also Money v. Barnhart*, 91 Fed.Appx. 210, 215, 2004 WL 362291, **3 (3d Cir. Feb. 25, 2004)(work at reasoning level 2 not inconsistent with requirement that work be simple, routine and repetitive).

Significantly, Summerville works as a meat wrapper at Albertson's.  The job of a meat wrapper also entails the ability "to carry out detailed but uninvolved written or oral instructions." *See* DOT 920.587-018.  Furthermore, even if the jobs of odd-jobs worker and industrial cleaner were eliminated, there would still be 1,300 bus person jobs available in New Mexico.  This number represents a significant number under the facts of this case.  *See Evans v.* Chater, 55 F.3d 530, 532 (10th Cir. 1995); see also *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992)(focusing, in step-five affirmance, on number of jobs rather than three occupations involved).

Finally, Summerville contends the jobs of odd-job worker and industrial cleaner "require occasional climbing which is outside [his] capability because of his seizure disorder."  Pl.'s Mem. in Support of Mot. to Remand at 12.  However, the ALJ found Summerville "should **avoid** . . . climbing ropes, ladders and scaffolds **to the extent that such postural maneuvers expose him to unprotected heights**."  Tr. 17 (emphasis added).  Having found that 1,300 bus person jobs is a significant number of jobs to support the ALJ's finding, at step five of the sequential evaluation

15

process, that Summerville was not disabled as he "retained the residual functional capacity (RFC) to perform work that existed in significant numbers in the National economy," the Court need not address this issue.

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**